*FILED*

FEB 04 2013

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**THOMAS R. SAUNDERS,**

    **Plaintiff,**

*vs.*                           **Civil Action No. 2:12CV38
(The Honorable John Preston Bailey)**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Thomas Saunders ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

### I. Procedural History

Plaintiff filed applications for SSI and DIB on December 4, 2007, alleging disability since November 1, 2007, due to spastic torticollis and hypertension (R. 165, 169, 193). The state agency denied Plaintiff's application initially and on reconsideration (R. 115-16, 117). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") J. E. Sullivan[1] held on March 17, 2008, and at

---

[1] Administrative Law Judge Sullivan was incorrectly listed as "J.E. Solomon" on the administrative hearing transcript (R. 64).

which Plaintiff, represented by counsel, Travis Miller, and Lawrence Ostrowski, a vocational expert ("VE"), testified (R. 130, 64-116). On June 19, 2009, the ALJ entered a decision finding Plaintiff was not disabled (R. 54-63). On July 8, 2009, Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council and submitted new evidence thereto (R. 4-46). On January 12, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-3). Plaintiff filed an appeal of the Commissioner's decision with the United States District Court for the Northern District of West Virginia on February 3, 2011; a summons was issued and executed (Civil Action No. 2:11CV10 - Docket Entries 1, 6, and 7). A Motion to Remand was filed by the Commissioner and granted by the District Judge (R. 429-31). Upon remand from the District Court, the Appeals Council, on June 29, 2011, vacated ALJ Sullivan's decision and remanded the case to an ALJ (R. 436-37). On January 25, 2012, ALJ Jeffrey P. LaVicka conducted a second administrative hearing, at which Plaintiff, represented by counsel, and VE Larry G. Kontosh testified (R. 368-412). On March 1, 2012, the ALJ entered a decision finding Plaintiff was not disabled. That decision was appealed to this Court (R. 350-62).

## II. Statement of Facts

Plaintiff was born on November 22, 1963, and was forty-eight (48) years old at the time of the January 25, 2012, administrative hearing (R. 373). Plaintiff had a high-school education (R. 376). His past work included a file clerk at a law office, manager of a liquor store, cash register supervisor at a drug store, and manager of a pizzeria (R. 379, 380, 381, 382).

Dr. Gutmann injected Plaintiff's neck with Botox on February 18, March 17, May 5, July 2, and October 13, 2004; January 19, April 27, August 12, and November 21, 2005; March 3, June 9, and September 8, 2006; and, February 2 and May 18, 2007 (R. 241-55, 258-84).

Plaintiff's June 23, 2004, cervical MRI showed mild degenerative changes without significant central canal or neural foraminal stenosis. His cord signal intensity and caliber were normal in appearance (R. 256). Plaintiff's brain MRI was normal (R. 257).

Plaintiff received chiropractic treatment from Dr. LeBenne on September 6, 9, 12, 14, 16, 19, 23, and 26, 2005; October 6, 10, 14, 17, 21, and 28, 2005; November 4, 11, and 18, 2005; December 1, 14, and 28, 2005; January 11 and 25, 2006; February 10 and 24, 2006; March 10 and 24, 2006; April 17, 2006; May 10 and 31, 2006; June 21, 2006; July 19, 2006; August 9 and 30, 2006; September 18, 2006; October 10 and 31, 2006; November 30, 2006; December 13 and 29, 2006; January 17, 2007; February 9, 2007; March 2 and 23, 2007; April 10 and 30, 2007; May 21, 2007; June 11, 2007; July 2 and 23, 2007; August 15, 2007; September 5 and 26, 2007; October 17, 2007; November 7 and 28, 2007; December 19, 2007; July 23, 28, and 30, 2008; August 6, 13, 20, and 27, 2008; December 13, 21, 23, 29, and 31, 2008; January 2, 6, 9, 12, 16, 20, 23, and 30, 2009; February 2, 9, 16 and 23, 2009; March 2 and 9, 2009; April 23 and 29, 2009; May 13 and 26, 2009; March 1, 3, 8, 10, 15, 19, 26, and 29, 2010; and April 2, 9, and 16, 2010 (R. 294-346, 592-).

Plaintiff was examined by Dr. Angotti on June 26, 2006. Plaintiff had no complaints. Dr. Angotti found Plaintiff's cranial nerves were intact; his strength was 5/5 and equal bilaterally; and his reflexes were 2+ and equal bilaterally. Plaintiff's exam was normal. He was diagnosed with accelerated hypertension and nephrolithiasis. Plaintiff was to follow up with the neurology department at West Virginia University, and he was encouraged to diet (R. 292-93).

Dr. Angotti examined Plaintiff on July 31, 2006. His examination was normal. Plaintiff had no complaints. Dr. Angotti diagnosed benign hypertension; "spastic torticolis (sic), quiescent"; nephrolithiasis; and morbid obesity. Plaintiff was encouraged to diet and exercise (291).

3

Dr. Angotti examined Plaintiff on February 5, 2007. The examination was normal. Plaintiff had no complaints, except for neck pain. He was diagnosed with hypertension, spastic torticollis, obesity, and nephrolithiasis. He was encouraged to diet and exercise (R. 290).

Plaintiff had no complaints during his August 23, 2007, examination by Dr. Angotti, which was normal. He was diagnosed with benign hypertension, glucose intolerance, spastic torticollis, and obesity and was encouraged to diet and exercise (R. 289).

Dr. Gutmann wrote a letter to Dr. Angotti on September 28, 2007; she injected his neck with Botox (R. 240).

Dr. Angotti examined Plaintiff on November 30, 2007. He weighed was two-hundred-sixty (260) pounds. His examination was normal; he had no complaints. Dr. Angotti diagnosed spastic torticollis, benign hypertension, which he treated with over-the-counter potassium supplements, nephrolithiasis, glucose intolerance, morbid obesity, and adenomatous colon polyp. Plaintiff was encouraged to diet and exercise (R. 288).

Dr. Gutmann wrote a letter dated January 17, 2008, wherein she opined Plaintiff had "severe cervical dystonia (retrocollis) which cause[d] significant pain and disability when not treated." Plaintiff "respond[ed] well to recurrent injections" of Botox (R. 239).

Dr. Orvik completed a Disability Determination Examination of Plaintiff on January 17, 2008. Plaintiff's "main problem" was spastic torticollis with pain and muscle spasm in his neck. Plaintiff reported he had been receiving Botox injections for his condition, but he had lost his insurance when he quit his job and could not afford the treatments (R. 221). Plaintiff reported that chiropractic treatment and massage helped his condition. He medicated with amlodipine, metoprolol, and tizanidine (R. 222). Upon examination, Dr. Orvik found Plaintiff weighed two-hundred-sixty-

nine (269) pounds (R. 223). Dr. Orvik diagnosed spastic torticollis, exogenous obesity, and hypertension (R. 224). Dr. Orvik found Plaintiff's range of motion of his neck was decreased and he had neck muscle spasm and tenderness. Plaintiff could sit, stand, walk, handle, hear, and speak. His ability to lift, carry, and travel in a vehicle were affected by neck pain (R. 225).

Dr. Franyutti, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on January 29, 2008. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of six (6) hours in an eight (8) hour work day; sit for a total of six (6) hours in an eight (8) hour work day; and push/pull unlimited (R. 229). Dr. Franyutti found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; Plaintiff could never climb ladders, ropes, and scaffolds and could never crawl (R. 230). Dr. Franyutti found Plaintiff had no manipulative, visual, or communication limitations (R. 231-32). Plaintiff should avoid even moderate exposure to hazards; he should avoid concentrated exposure to extreme cold; he was unlimited in his exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 232). Dr. Franyutti reviewed Dr. Orvik's medical records . He reduced Plaintiff to light work (R. 234).

Dr. Franyutti's findings were affirmed by Dr. Osborne on March 7, 2008 (R. 236).

On July 23, 2008, Plaintiff had a cervical spine x-ray made at the chiropractor's office. It showed subluxation of C7, C3, C6; reversal of normal cervical lordosis; moderate degenerative disc narrowing at C4/C5, C5/C6, C6/C7, C7/T1; marginal hypertrophic spurring at C4; and marked hypertrophic spurring at C5, C6, and C7. The x-ray showed moderate to severe degenerative disc disease of the cervical spine (R. 567).

Dr. Klein completed a Medical Assessment of Ability to do Work-Related Activities

5

(Mental) of Plaintiff on February 12, 2009. He found Plaintiff's abilities to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, and function independently were poor. Dr. Klein found Plaintiff's ability to understand, remember and carry out complex job instructions was poor. Plaintiff's ability to understand, remember, and carry out detailed, but not complex, job instructions was fair. His ability to understand, remember, and carry out simple job instructions was good (R. 549). Dr. Klein found Plaintiff's ability to maintain personal appearance and demonstrate reliability was fair, and his ability to behave in an emotionally stable manner and relate predictably in social situations was poor (R. 550).

Also on February 12, 2009, Dr. Klein completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had affective disorders, specifically, depressive syndrome characterized by anhedonia or pervasive loss of almost all activities, sleep disturbances, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking (551, 554). Dr. Klein found Plaintiff had marked limitations in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Dr. Klein found Plaintiff had experienced one (1) or two (2) episodes of decompensation (R. 561). Dr. Klein opined Plaintiff's depression was "reactive to his deteriorating physical condition. As the physical condition exacerbates, he will experience more severe depression." Plaintiff would experience loss of self esteem, ability to concentrate, and ability to stay focused on a task. Dr. Klein found Plaintiff's physical condition would "continue to impact . . . his ability to relate to others, including employees, supervisors, and the public." Plaintiff, according to Dr. Klein, would be an "extremely poor risk for employment," which would "exacerbate his physical and psychological condition[s]" (R. 563).

In Dr. Gutmann's February 27, 2009, letter to Plaintiff's lawyer, she wrote that Plaintiff

received injections of botulinum toxin, which "last[ed] only weeks to months," for treatment of spasmodic torticollis, which caused involuntary contractions of muscles, pain, fatigue, and head rotation  The injections could not be administered more frequently than at three (3) month intervals. Dr. Gutmann found Plaintiff's symptoms credible.  Dr. Gutmann found Plaintiff could not use his upper extremities on a repetitive basis during an eight (8) hour workday because such use made his symptoms worse.  Dr. Gutmann wrote the medication Plaintiff took to treat his condition reduced his ability to concentrate, and his symptoms were unpredictable. Dr. Gutmann found Plaintiff would need frequent breaks from work and would miss two (2) or more days of work per month.  Dr. Gutmann found Plaintiff was unable to work full time (R. 345).

On March 2, 2009, Dr. LeBenne, Plaintiff's chiropractor, wrote a letter wherein he opined Plaintiff had realized "marginal improvements" in his symptoms during the years he had treated him. Dr. LeBenne confirmed the findings of Plaintiff's July 23, 2009, cervical x-rays and found the x-rays showed moderate to severe degenerative disc disease of the cervical spine (R. 346).

On May 4, 2009, Dr. Gutmann wrote to Dr. Angotti that she had examined Plaintiff for the first time since September, 2007, because he had quit his job in October, 2007, due to the "physical work he had to do," and had lost his insurance. Dr. Gutmann wrote Plaintiff "had been responding well for many years to 400 units of botulinum toxin every 3-4 months . . . ."  Plaintiff was in no distress.  His reflexes were 2+ and equal (R. 574).  Dr. Gutmann wrote Plaintiff's condition "continue[d] to be a significant problem" and that she would "work with his insurance" to gain approval for Botox injections because those injections "did work quite well for him" (R. 575).

In a May 15, 2009, letter to Dr. Angotti, Dr. Gutmann wrote Plaintiff had not had "suffered greatly without" Botox injections.  Dr. Gutmann injected Plaintiff with botulinum toxin (R. 572).

Dr. Gutmann wrote to Dr. Angotti on August 28, 2009, that Plaintiff's May 15, 2009, injection "lasted about two weeks." Plaintiff was having "some more problems with his right arm" and he could not raise it above his shoulder. Dr. Gutmann wrote that Plaintiff was a "drummer and after repeated drumming, he [would] get some numbness in his right arm and some pain." She noted Plaintiff had "mild degenerative arthritis at multiple levels" (R. 570). Dr. Gutmann informed Dr. Angotti that Plaintiff's strength was 5/5 in his upper extremities, "except for his infraspinatus on the right." Dr. Gutmann wrote she had ordered Plaintiff to undergo a cervical MRI (R. 571).

On September 25, 2009, a MRI of Plaintiff's cervical spine showed "straightening of the normal cervical lordosis"; increased T1 and T2 signals which "may represent degenerative endplate changes"; no cord compression; no definitive cord signal abnormality; unremarkable appearances of C2-C3, C3-C4, C4-C5; a broad based disk bulge with herniation at C5-C6; mild central canal stenosis; right neural foraminal stenosis; and broad based disk bulge at C6-C7 (R. 568-69). The technician noted the following: "Study is markedly limited by patient motion, but despite anesthesia, these are best images available. I believe overall this study is minimally diagnostic; however, if the patient's symptomatology does not improve and/or worsens, general endotracheal anesthesia with paralytics would be necessary" (R. 568).

Plaintiff's October 28, 2009, nerve conduction study showed no right cervical radiculopathy; his right upper extremity was normal (R. 584).

On November 5, 2009, Dr. Gutmann wrote to Dr. Angotti that Plaintiff had bilateral neck pain and arm weakness but no radiculopathy. Dr. Gutmann wrote Plaintiff "did well with his last Botox injection" and he was medicating with Norvasc, metoprolol and tizanidine. Her diagnosis was "retrocollis with neck pain most likely from his arthritis" (R. 582). Dr. Gutmann wrote that she was

"going to hold off on him seeing a surgeon" because he had no cervical radiculopathy (R. 582-83).

Dr. Kafka conducted a rheumatological consultative examination of Plaintiff on November 16, 2009 (R. 672). Dr. Kafka found Plaintiff was positive for muscle spasms, anxiety, and depression (R. 674). Dr. Kafka found Plaintiff's cervical spine had limited range of motion and his shoulders were positive for crepitus. Plaintiff's strength was good; his reflexes were normal; he had no neurological deficits. Dr. Kafka reviewed Plaintiff's MRI, diagnosed degenerative disc disease of the cervical spine, and prescribed naproxen and tramadol (R. 675-76).

Dr. Gutmann wrote, in a December 4, 2009, letter to Dr. Angotti, that Plaintiff had "started getting effect from [the August injection] in about two weeks, but he [said] it only lasted for two weeks at its full amount." Dr. Gutmann wrote that Plaintiff's strength had returned in his shoulder. Dr. Gutmann injected Plaintiff with botulinum toxin (R. 580).

In Dr. Gutmann's March 5, 2010, letter to Dr. Angotti, she wrote Plaintiff had realized relief with his December injection of botulinum toxin two (2) weeks after the injection and the relief lasted two (2) months. Dr. Gutmann injected Plaintiff with botulinum toxin (R. 578).

Plaintiff was examined by Dr. Angotti on March 20, 2010. Plaintiff complained of neck pain and spasm. He was diagnosed with glucose intolerance, torticollis, benign hypertension, hyperlipidemia, colon adenoma, herniated disc in the cervical spine, history of nephrolithiasis, and morbid obesity. Plaintiff was encouraged to diet and exercise (R. 696).

Dr. Kafka prescribed tramadol on March 27 and naproxen on June 2, 2010 (R. 689-90).

In a June 4, 2010, letter from Dr. Gutmann to Dr. Angotti, she wrote the effects of Plaintiff's March injection "lasted about three weeks and then he started having pulling again"; he experienced "a lot of pain in his neck and pulling." She injected Plaintiff with botulinum toxin (R. 576).

On June 7, 2010, Plaintiff's mother, Nina Saunders, submitted an affidavit wherein she affirmed that, among other things, Plaintiff had not "functioned well with botox (sic) injections"; the relief he realized from the injections were "very inconsistent and only temporary"; his relief was usually "modest . . . [and] very short lived"; he had "good functioning" with the injections; she assisted Plaintiff with "reading, cooking, cleaning, etc."; Plaintiff was unable to mow the lawn and do "small household repairs"; Plaintiff was unable to afford treatment by Dr. Gutmann when he did not have insurance; Plaintiff received a medical card on December 17, 2008, and "immediately" contacted Dr. Gutmann to "schedule an appointment"; Plaintiff had been a drummer since childhood but had been unable to drum for "many years" because of his condition; and Plaintiff attempted to drum with a church band "on only a few occasions" and was "unable to continue because the activity severely exacerbated his condition" (R. 503-05).

After she reviewed the ALJ's June 19, 2009, decision, Dr. Gutmann wrote a letter to Plaintiff's lawyer on June 16, 2010, to "comment on this case." Dr. Gutmann wrote Plaintiff did not exaggerate his symptoms, and they were consistent with his medical condition and her medical findings. Dr. Gutmann wrote Plaintiff's muscle spasms resulted in his head involuntarily pulling back and to the side. His torticollis was "quite severe." Dr. Gutmann wrote that Plaintiff had "responded to maximal botulinum toxin injections at times," but they provided "only temporary relief of [Plaintiff's] symptoms." With injections, Plaintiff realized "relief sometimes . . . soon after the injection and last[ed] for 2-2 ½ months. . . . Other times, the relief [was] minimal and only last[ed] a couple of weeks." Plaintiff experienced "some decrease in the pulling of his head back as well as some pain reduction." Dr. Gutmann found the following:

[I]t [was] inaccurate to state that [Plaintiff] ha[d] good functionality with injections without acknowledg[ing] the varying, and often short lived, relief he receive[d] from

the injections. His functionality [was] not constant. Even with a good response to injections, he [would] still get increase in dystonic posturing . . . and pain with activity, including use of his arms such as lifting or repetitive movements. He may have some periods of time when he ha[d] good relief from the injections and, thus, his functioning improve[d]. He may have more time when he experience[d] significant pain and head tilting. During those times, his functioning would be poor (R. 565).

Dr. Gutmann wrote Plaintiff received regular injections when he had a medical card. She opined Plaintiff could not perform light work, as found by the ALJ. Dr. Gutmann wrote that Plaintiff would be "highly distracted" by pain and "not focused on the task at hand." Dr. Gutmann wrote Plaintiff's ability to work varied from day to day and that he would be absent from work several days per month. Dr. Gutmann opined Plaintiff could not "perform any level of full-time work" (R. 566).

Robert Romano completed a West Virginia Department of Health and Human Resources Medical Review of Plaintiff on July 13, 2010. He noted Plaintiff's treating physicians were Dr. Angotti, Dr. Gutmann, and Dr. Kafka (R. 664). Dr. Roman listed Plaintiff's diagnoses as disc disorder, cervical dystonia, morbid obesity, hypertension, and osteoarthritis. He found Plaintiff should avoid all work situations and should be referred for vocational rehabilitation (R. 665-66).

Dr. Kafka prescribed tramadol to Plaintiff on July 29, 2010 (R. 688).

Plaintiff received a botulinum injection from Dr. Gutmann on September 3, 2010 (R. 700).

Plaintiff's September 13, 2010, CT scan of his neck showed "scattered subcentimeter lymph nodes," none of which were enlarged. No "other significant abnormality" was noted (R. 701).

Plaintiff was examined by Dr. Angotti on October 15, 2010. He was diagnosed with torticollis; benign hypertension; glucose intolerance; hyperlipidemia; herniated disc in cervical spine; history of nephrolithiasis; morbid obesity; and enlarged lymph node, for which he was referred to Dr. Villarreal for a second opinion. Plaintiff was instructed to diet and exercise (R. 695).

Plaintiff presented to Dr. Angotti on October 28, 2010, for an "unscheduled visit for medical

conference regarding . . . lab work." They discussed non-insulin dependent diabetes, treatments therefor, eye and foot care, exercise and weight loss, and diet (R. 694).

Plaintiff was examined by Dr. Gutmann on December 3, 2010. She found that Plaintiff had "limited response" to the "last 2 injections." Dr. Gutmann found there was a change in Plaintiff's head position. Dr. Gutmann injected Plaintiff with botulinum toxin (R. 702-03).

Dr. Kafka prescribed tramadol to Plaintiff on December 6, 2010 (R. 687).

Dr. Angotti examined Plaintiff on February 1, 2011. Plaintiff had no complaints. Dr. Angotti diagnosed benign hypertension, non-insulin dependent diabetes, morbid obesity, hyperlipidemia, nephrolithiasis, herniated cervical spine disc "quiet," and "torticolis (sic), stable clinically." Dr. Angotti instructed Plaintiff to diet and exercise (R. 693).

On March 4, 2011, Plaintiff was examined by Dr. Gutmann. She noted Plaintiff had medicated with Artane and Klonopin, which "did not help." Dr. Gutmann opined "Botox shots in the neck significantly help[ed]. Last time[,] he again had good response but lasted only about 3 weeks and then became tight again." Plaintiff medicated with tizanidine, naproxen, tramadol, amlodipine, and metoprolol. Dr. Gutmann injected Plaintiff with botulinum toxin (R. 704-05).

On March 31, 2011, Dr. Klein completed a Psychological Evaluation of Plaintiff upon referral from Plaintiff's lawyer. Plaintiff reported he medicated his spasmodic torticollis symptoms with tizanidine, metoprolol, and amlodipine. Plaintiff stated his condition had worsened; he had been diagnosed with cervical degenerative arthritis; he experienced constant pain; the sudden neck jerking caused embarrassment; he had diminished concentration; he had been severely depressed; he had difficulty going to sleep and staying asleep; but he had a good appetite. Plaintiff described his mood as depressed, nervous, fearful, and discouraged. Plaintiff watched television, listened to

the radio, and watched birds (R. 544). Plaintiff's WRAT4 scores were as follows: word reading, sentence comprehension, and spelling were greater than twelfth grade and math computation was at the sixth grade level. Plaintiff's WAIS-III scores were 114 verbal IQ, 109 performance IQ, and 112 full-scale IQ (R. 545). Plaintiff's PSI results were normal or above average. The BDI-II test showed moderate depression. Plaintiff was scored as having mild anxiety on the BAI test. Plaintiff's results on the BPRS "suggested severe depressed mood, moderate to severe anxiety, tension, depressed mood and somatic concerns consistent with his physical condition" (R. 546). The results of Plaintiff's MMPI2 showed elevated hypochondriasis, elevated hysteria, and significant level of depression. Dr. Klein diagnosed the following: Axis I - major depressive disorder, recurrent, severe; pain disorder associated with both psychological and medical conditions, chronic; Axis II - no diagnosis; Axis III - retrocollis and early onset cervical degenerative arthritis; Axis IV - health, personal and economic problems; and Axis V - GAF 45 (R. 547).

Dr. Klein found Plaintiff was friendly and cooperative. He was "very intelligent." Dr. Klein found Plaintiff was not "malingering or faking." Dr. Klein found Plaintiff was embarrassed by his neck muscles jerking; he was severely depressed; he experienced almost constant pain; he would not function well in a stressful situation; and his feelings of helplessness and worthlessness were intensified by his "overall psychological state of mind." Dr. Klein found Plaintiff would have "significant difficulty in concentrating, staying focused, and on task" (R. 547).

Dr. Kafka examined Plaintiff on May 5, 2011. His cervical spine was tender with reduced range of motion. Dr. Kafka diagnosed osteoarthritis and prescribed tramadol (R. 670-71).

On June 1, 2011, Plaintiff received a botulinum toxin injection from Dr. Gutmann, who noted that Plaintiff's "[l]ast injection helped for about 2 weeks – he [was] not getting prolonged response

any more. Nothing else has changed significantly." Plaintiff medicated with tizanidine, naproxen, amlodipine, and metoprolol. Dr. Gutmann found Plaintiff's retrocollis was "marked . . . with head back and slight tilt to left" (R. 706).

Dr. Kafka prescribed naproxen to Plaintiff on August 17, 2011 (R. 685).

On August 25, 2011, Plaintiff was examined by Dr. Angotti, who diagnosed cervical torticollis, hyperlipidemia, herniated cervical spine discs, colon adenoma, morbid obesity, and osteoarthritis. He instructed Plaintiff to diet and exercise (R. 692).

On September 7, 2011, Psychologist Martin Levin, M.A., completed a Mental Status examination of Plaintiff. Plaintiff was appropriately dressed and groomed. He drove himself to the evaluation. His head was "tilted to one side," but he had no "other unusual involuntary movements." Plaintiff's chief complaints were spasmodic torticollis and stress, which was caused by pain (R. 586). Plaintiff appeared depressed. He stated he was irritable, was anxious, had decreased energy, and had decreased interests. Plaintiff stated his sleep and appetite were "good" (R. 587).

Upon examination, Mr. Levin found Plaintiff's attitude, behavior, speech, appearance, thought process and content, perception, insight, psychomotor behavior, immediate memory, recent memory, remote memory, concentration, persistence, pace, and social functioning were normal (R. 587-88). Plaintiff's mood was euthymic, and his affect was broad (R. 587). Plaintiff described his activities of daily living as follows: rose at 8:00 a.m., watched television, did laundry or cooked, occasionally went to lunch with his son, and cared for his personal needs. Shaving, however, was difficult due to "problem with his neck." Plaintiff enjoyed spending time with his grandchildren. He did not belong to any social organization; he did not attend church. He did not "do the things he used to enjoy." Mr. Levin made the following diagnosis: Axis I - no conditions present; Axis II -

no conditions present; Axis III - spasmodic torticollis. Plaintiff's prognosis was good (R. 588).

Plaintiff received a botulinum toxin injection from Dr. Gutmann on September 28, 2011. She noted the "[l]ast injection gave him about 12 hours of excellent relief then head started to pull again." Plaintiff medicated with tizanidine, naproxen, amlodipine, and metoprolol (R. 707).

On October 25, 2011, Mr. Levin completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). He found Plaintiff had no limitations in his ability to understand, remember, and carry out work instructions; interact appropriately with supervisors, co-workers, and the public; or respond to changes in routine work settings (R. 589-90).

Administrative Hearing

An administrative hearing was held by ALJ LaVicka on January 25, 2012. Plaintiff testified that he dieted by reducing his "intake [of food] by half." He stated that exercise, including walking, affected his neck (R. 373). Plaintiff stated he could not "lift much weight" and he could not do "repetitive upper body movements" (R. 374). Plaintiff testified he climbed steps ten (10) or fifteen (15) times per day (R. 375). He had a valid driver's license and drove a "couple times a week." Plaintiff helped his mother by driving her to the store, church, and choir practice (R. 376).

Plaintiff testified that spasmodic torticollis, osteoarthritis, disk herniations, and loss of mobility in his right arm caused him to be unable to work full time. Stress exacerbated muscle spasms. His doctor did not "want [him] lifting anything or doing anything that use[d] the same muscle movements over and over" (R. 383). Because of the position of his head, caused by his neck pulling, Plaintiff needed to stand in order to "look down at a desk." Plaintiff testified he medicated with tizanidine, naproxen, tramadol, amlodipine, and metoprolol, from which he experienced no side effects. Plaintiff stated he had received an injection of a "new type of Botox that was just made

15

available from the FDA in 2010 because the "regular Botox didn't work" (R. 384).

Plaintiff testified he spoke to his sons daily and to his friends weekly on the telephone. Plaintiff's friends visited him at his home; they watched television. Plaintiff had last seen a movie in a theater in October 2011 (R. 385). Plaintiff testified he cooked once per month for his grandchildren; shopped for groceries once or twice a week; washed dishes once or twice a week; did laundry once a week; and made his bed daily. Plaintiff did not vacuum (R. 386). Plaintiff stated he no longer attended church and had last gone to church at "Christmastime" to hear his mother sing in a choir (R. 387). Plaintiff stated he last played the drums in 2008 (R. 387-88). Plaintiff testified he watched television or birds with his grandchildren. He used the computer one (1) time every two (2) or three (3) days (R. 388). Plaintiff testified his condition and symptoms were different from day to day (R. 392). Plaintiff stated he did not do his activities of daily living when his symptoms were increased (R. 392-93). Plaintiff testified that if he "force[d] [his] head to look down, the muscles contact[ed] and pull[ed] [his] head back up and to the side" (R. 396). Plaintiff testified that pain interfered with his ability to concentrate and he was depressed (R. 400).

The ALJ asked the VE the following hypothetical question:

> . . . [A]ssume a hypothetical individual of the same education, age, . . ., and work experience as the claimant, who retains the capacity to perform sedentary work with occasional posturals except no climbing of ladders, ropes or scaffolds, who's limited to occasional rotation, flexion or extension of the neck, with only occasional use of arms, must avoid all exposure to extreme cold, must avoid moderate exposure to unprotected heights, hazardous machinery, and commercial driving, would be limited to jobs that are simple and routine in nature, involving one to seven step tasks. Are there any jobs in the regional or national economy that such an individual could perform? (R. 406-07).

The VE responded that jobs of telephone solicitor, call-out operator, and appointment clerk were available to such a hypothetical person (R. 407).

16

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ LaVicka made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011 (R. 352).

2.  The claimant has not engaged in substantial gainful activity since November 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*). The claimant has the following severe impairments: spasmodic torticollis (cervical dystonia) with neck and muscle spasms; degenerative disc disease of the cervical spine; and obesity (20 CFR 404.1520(c) and 416.920(c)) (R. 352-53).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 353).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following exceptions: can perform all postural movements occasionally, except cannot crawl or climb ropes, ladders, or scaffolds; can occasionally use neck to flex forward and/or rotate side-to-side or forward; can perform activities requiring only occasional use of the arms; must avoid all exposure to extreme cold; can have no more than occasional exposure to unprotected heights, hazardous machinery, and commercial driving; due to diminished concentration, he is limited to jobs that are simple, routine in nature involving one-to-seven-step tasks (R. 354).

5.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6.  The claimant was born on November 22, 1963 and was 43 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 360).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 360-61).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 361).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties[2]

The Plaintiff contends:

1.  The ALJ erred because he failed to follow the Appeals Council's Order.

2.  The ALJ erred because he ignored a treating specialist's opinion and failed to properly consider other treating specialist opinions and medical opinions.

3.  The ALJ committed an error of law because he ignored a third-party affidavit.

4.  The ALJ committed an error of law because he improperly gave significant weight to the opinions of the state-agency reviewing physicians over the opinion of the treating specialist.

5.  The ALJ's credibility finding is not supported by substantial evidence and based on an error of law because it is based on inappropriate reasoning and speculation.

## C. Appeals Council

Plaintiff contends the ALJ erred because he failed to follow the Appeals Council's Order; specifically, Plaintiff asserts the ALJ failed to obtain evidence from a medical expert relative to Plaintiff's impairment (Plaintiff's brief at p. 6). Defendant asserts the following:

> [Plaintiff] . . . contends that the ALJ failed to follow the Appeals Council's Order because he did not obtain evidence from a medical expert (Pl.'s Br. at 6-7). There is no merit to this argument. The Appeals Council remanded the case to an ALJ upon remand from the District Court (Tr. 436). The District Court entered an Order consistent with the Commissioner's motion, which provided, in relevant part, that the ALJ would obtain a consultative mental status evaluation[,] "if necessary," and made no reference to the need for a medical expert (Tr. 429-30). Moreover, the Appeals Council specifically relied upon the Commissioner's regulations, 20 C.F.R. §§ 404.1527(f), 416.927(f) (2011),[0] which provide that "Administrative law judges _may_ also ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) . . ." (emphasis added). By citing the regulation, the Appeals Council recognized that it is within the discretion of the ALJ to determine whether an expert opinion is necessary (Tr. 436). (Defendant's brief at pp. 8-9.)

---

[2]The Commissioner does not list any contentions in his brief. He defends the ALJ's decision relative to the assertions made by Plaintiff.

The undersigned disagrees with Defendant. The Appeals Council remanded this matter to an ALJ with the specific directions, one of which was to obtain evidence from a medical expert, and it was the duty of the ALJ to follow the Appeals Council's Order.

As noted above, case numbered 2:11CV10 (N.D.W.Va) was remanded to the Commissioner, by the District Court on Defendant's Motion for Remand, "so that the administrative law judge may consider the new and material evidence submitted in connection with the request for review; evaluate the severity of Plaintiff's mental impairment; obtain a consultative mental status evaluation, if necessary; and obtain evidence from a vocational expert, if necessary" (R. 430). The District Judge entered an order granting the Defendant's motion and remanding the case "to the Commissioner for further proceedings consistent with this motion" and in accord with the "sixth sentence of 42 U.S.C. § 405(g)" (R. 429). The Appeals Council, subsequent to the District Court's remand, entered its June 29, 2011, order, which reads as follows:

> The U. S. District Court for the Northern District of West Virginia, Elkins (Civil Action Number 2:11-cv-10 ) has remanded this case to the Commissioner of Social Security for further administrative proceedings in accordance with the sixth sentence of section 205(g) of the Social Security Act.
>
> The Appeals Council hereby vacates the final decision of the Commissioner of Social Security and remands this case to an Administrative Law Judge for resolution of the following issue:
>
> - The claimant's representative submitted to the Appeals Council new and material evidence regarding the claimant's mental condition. There is a psychological evaluation dated February 12, 2009, treatment notes from University Health Associates from May 4, 2009 through August 28, 2009. Also, MRI of cervical spine dated September 5, 2009, letter from Laurie Gutmann, M.D., dated June 16, 2010, and an affidavit from Nina A. Saunders dated June 7, 2010. This evidence relates to the period at issue and requires consideration in assessing the claimant's residual functional capacity.
>
> Upon remand the Administrative Law Judge will:

- Obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments (20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p).

- Further evaluate the claimant's mental impairment in accordance with the special technique described by 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).[3]

---

[3]Although not raised in Plaintiff's Motion for Summary Judgment and supporting brief, the undersigned notes the ALJ failed to follow this Appeals Council's directive. 20 C.F.R. § 404.1520a describes the "special technique" that must be followed "at each level in the administrative review process" to evaluate mental impairments. Further, 20 C.F.R. § 404.1520a(c) provides, in part, the following:

> *Rating the degree of functional limitation.*
>
>                   . . .
>
> (3)    We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.
>
> (4)    When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

A review of the decision reveals the ALJ did not document the special technique when assessing Plaintiff's mental impairment as so ordered by the Appeals Council. Further, the ALJ failed to identify the four broad functional areas and failed to rate the degree of Plaintiff's functional limitation (i.e., activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation) using the five-point and four-point scales.

- Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p).

In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision (R. 436-37).

The ALJ in this case was bound by the Appeal Council's Order even if the 2:11CV10 (N.D.W.Va.) case was remanded to the Commissioner by order of the District Court.

20 C.F.R. § 404.983 reads, in part, as follows:

When a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge with instruction to take action and issue a decision. If the case is remanded by the Appeals Council, the procedures explained in § 404.977 will be followed. . . .

20 C.F.R. § 404.977 provides, in part, the following:

(a) *When the Appeals Council may remand a case.* The Appeals Council may remand a case to an administrative law judge so that he or she may hold a hearing and issue a decision or a recommended decision. The Appeals Council may also remand a case in which additional evidence is needed or additional action by the administrative law judge is required.

(b) *Action by administrative law judge on remand.* The administrative law

judge **shall** take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order. (Emphasis added.)

It is clear that the Appeals Council did not leave it to the "discretion of the ALJ," as argued by Defendant, "to determine whether an expert opinion is necessary" (Defendant's brief at p. 10). The Appeals Council noted the case was remanded from District Court, vacated the prior decision of the Commissioner, remanded the matter to an ALJ, and specifically directed the ALJ to consider new and material evidence, further evaluate Plaintiff's mental impairment, obtain evidence from a VE, further consider Plaintiff's maximum residual functional capacity, and "[o]btain evidence from a medical expert" in order to "clarify the nature and severity of the claimant's impairment" in accord with "(20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-69)" (R. 436).

The undersigned finds the ALJ did not comply with the Appeals Council's Order as required. A review of the evidence, transcript of the administrative hearing, and the ALJ's decision shows that the ALJ did not obtain evidence from a medical expert. After the Appeals Council's remand on June 29, 2011, the record contains no evidence from a medical expert, except treatment notes from Drs. Kafka, Gutmann, and Angotti (R. 685, 692, 707). There is a September 7, 2011, Mental Status examination and an October 25, 2011, Medical Source Statement of Ability to Do Work-Related Activities (Mental) by Mr. Levin, but there is no evidence by a medical expert as to Plaintiff's physical impairments except as noted above (R. 586-90).

Moreover, in his decision, the ALJ failed to list the directive from the Appeals Council that he obtain evidence from a medical expert relative to Plaintiff's impairments. The ALJ noted only the following: "Pursuant to the District Court remand order, the Appeals Council has directed the undersigned to consider the new and material evidence submitted in connection with the claimant's

request for review; evaluate the severity of the claimant's mental impairment; obtain a consultative mental status evaluation; and[,] if necessary[,] obtain evidence from a vocational expert" (R. 350). At the administrative hearing, the ALJ noted only that the "District Court remanded [the matter] on a request of the Commissioner for Social Security . . . to consider new evidence from a mental health expert, which I have done" (R. 372).

The ALJ did not take the specific action that was ordered by the Appeals Council, and he was bound to do so. See *Deane v. Barnhart*, 2006 WL 2787052, *2, (W.D.Va. Sept. 26, 2006) (holding the ALJ erred in not taking action consistent with the Appeals Council's remand order when evaluating limitations imposed by severe mental impairments). "When the Appeals Council remands a case, the ALJ must take the action the Appeals Council orders. . . . An ALJ's failure to comply with an Appeals Council's order may result in remand." *Brady v. Commissioner*, 2008 WL 4181376, *24, (N.D.W.Va. Sept. 5, 2008) citing *Geracitano v. Callahan*, 979 F.Supp. 952, 957 (W.D.N.Y. 1997); *Lancaster v. Sullivan*, 1992 U.S. Dist. LEXIS 7057, at *12 (N.D.Ill. May 22, 1992). The ALJ's failure to obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment is contrary to the Appeals Council's order; therefore, the decision of the ALJ is not supported by substantial evidence.

### D. Treating Physician

Plaintiff next contends the ALJ erred because he ignored a treating specialist's opinion and failed to properly consider the opinions of Plaintiff's treating specialist and other medical opinions. Plaintiff specifically asserts that the ALJ failed to evaluate and consider Dr. Gutmann's June 16, 2010, letter as directed by the Appeals Council and failed to follow the "treating physician rule" when evaluating Dr. Gutmann's opinions. The undersigned agrees that the ALJ did not follow the

Appeals Council's Order. As noted above, the ALJ is bound by the order of the Appeals Council, and the Appeals Council ordered the ALJ to consider new and material evidence, which included the June 16, 2010, letter from Dr. Gutmann. In this case, the ALJ did not consider or evaluate Dr. Gutmann's June 16, 2010, letter. It is not even mentioned in the decision. Defendant asserts that Plaintiff's argument is flawed because the ALJ considered Dr. Gutmann's January 17, 2008, and February 27, 2009, letters, which, according to Dr. Gutmann, "taken as a whole, express [her] opinion of [Plaintiff's] condition during the time relevant to this case . . ." (R. 566) (Defendant's brief at p. 12). The undersigned disagrees. The Appeals Council ordered the ALJ to consider the June 16, 2010, letter of Dr. Gutmann. The ALJ erred in not doing so, and his decision, therefore, is not supported by substantial evidence.

As to the argument that the ALJ failed to properly evaluate the opinions of the treating physician, having found the ALJ erred because he failed to follow the Appeals Council Order to consider the June 16, 2010, letter by Dr. Gutmann, it follows that substantial evidence does not support the ALJ's evaluation Plaintiff's treating physician's opinions. The undersigned, therefore, does not analyze the issue of whether the ALJ erred in his evaluation of the opinions of Dr. Gutmann and the other opinion evidence of record.

### E. Third Party Affidavit

Plaintiff next asserts the ALJ failed to consider or evaluate the affidavit submitted by Plaintiff's mother, Nina Saunders. Defendant asserts that, "[w]hile the ALJ did not expressly mention the affidavit in the hearing decision, he considered it with all of the evidence in the record" (Defendant's brief at p. 13). A review of the ALJ's decision shows that the ALJ neither mentioned nor considered the affidavit in his decision. Plaintiff, in his brief, specifically asserts, in part, that

the ALJ was required to assess Mrs. Saunders' affidavit in accord with 20 C.F.R. § 404.1529(c)(4), which mandates that the Commissioner "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you." The undersigned agrees with this assertion. Additionally, the undersigned notes that the Appeals Council's expressly accepted Mrs. Saunders affidavit as new and material evidence because it "relate[d] to the period at issue and require[d] consideration in assessing the claimant's residual functional capacity." The ALJ, once again, failed to follow the Order of the Appeals Council in that he did not consider this evidence. As discussed above, the Order of the Appeals Council is binding on the ALJ. The ALJ's failure to consider Mrs. Saunders' affidavit is contrary to the Appeals Council's Order; therefore, the decision of the ALJ is not supported by substantial evidence.

### F. State Agency Physician Opinion

Plaintiff asserts the ALJ erred in the weight he gave he gave to the state agency physicians "over the opinion of the treating specialist" (Plaintiff's brief at p. 12). Defendant asserts that the "opinions of the state agency physicians support the ALJ's determination that [Plaintiff] was, at least, capable of performing sedentary work . . ." (Defendant's brief at p. 11).

20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence,

except for the ultimate determination about whether you are disabled.

The ALJ in this case "agreed" with the opinions of the state-agency consultative physicians, which is acceptable as noted above (R. 357). The undersigned, however, has found that the ALJ failed to evaluate all the evidence of record. 20 C.F.R. § 404.1527(c) provides that, "[r]egardless of its source, we will evaluate every medical opinion we receive." The ALJ failed to consider the June 16, 2010, letter written by Dr. Gutmann.

Since the undersigned has found substantial evidence does not support the decision of the ALJ because he failed to follow the Order of the Appeals Council by not considering the June 16, 2010, letter from Dr. Gutmann, it follows that substantial evidence does not support the weight the ALJ assigned to the opinions of the state agency physicians. The undersigned, therefore, does not herein fully analyze the issue of the weight the ALJ assigned to the state agency physicians "over the opinion of the treating specialist" (Plaintiff's brief at p. 12).

### G. Credibility

Plaintiff contends the ALJ's credibility finding is not supported by substantial evidence. Defendant asserts there is no merit to this argument. The Fourth Circuit has developed a two-step process for determining whether a person is disabled by pain or other symptoms as set forth in *Craig v. Chater*, 76 F.3d 585 (1996), which reads as follow:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also *"all the available evidence,"* including the claimant's medical history, medical signs, and laboratory findings, *see* id.*;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). See 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. See 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added.)

*Craig*, supra at 594.

In this case, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . .," thus meeting the first step of the analysis (R. 354). The ALJ was, therefore, required to take into account "all the available evidence" in evaluating Plaintiff's credibility. The ALJ failed to do this. As noted above, the undersigned has found the ALJ's decision is not supported by substantial evidence because he failed to follow the Order of the Appeal Council to obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairment, consider Dr. Gutmann's June 16, 2010, letter, and consider Mrs. Saunders' affidavit. It follows that substantial evidence does not support the ALJ's credibility finding. I, therefore, so find.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for

further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _4_ day of _February_, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE